2015 IL App (4th) 140703

NO. 4-14-0703

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| JAMES SMITH, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| ILLINOIS CENTRAL RAILROAD COMPANY, | ) | No. 05L117 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Rebecca Simmons Foley, |
| | ) | Judge Presiding. |

---

PRESIDING JUSTICE POPE delivered the judgment of the court, with opinion.
Justices Holder White and Steigmann concurred in the judgment and opinion.

**OPINION**

¶ 1        On January 27, 2014, after a jury verdict in favor of plaintiff, James Smith, the

trial court entered judgment in favor of plaintiff and against defendant, the Illinois Central

Railroad Company (Illinois Central).  On July 11, 2014, the court denied defendant's posttrial

motion but allowed credits from prior settlements to reduce the amount of the jury award.

Defendant appeals, arguing the trial court erred in multiple ways.  However, we address only

those issues necessary to decide this appeal.  We reverse the judgment in this case and remand

for a new trial because the trial court erred by preventing defendant from presenting evidence

regarding plaintiff's work history at the Union Asbestos & Rubber Company (UNARCO) facility

at the Bloomington rail yard.

¶ 2                                I. BACKGROUND

¶ 3    Because of the voluminous nature of the record in this case, we address only the facts necessary to decide this appeal. On July 21, 2005, plaintiff filed his complaint against Pneumo Abex Corporation; Pneumo Abex LLC; Metropolitan Life Insurance Company; Owens-Illinois, Inc.; Honeywell International, Inc.; Railroad Friction Products Corporation; and Illinois Central. As of October 2013, the only defendant remaining in this case was Illinois Central.

¶ 4    On October 1, 2013, the trial court held a final pretrial hearing in this case. One of the issues considered by the court was plaintiff's motion *in limine*, which sought to prohibit defendant from introducing any evidence plaintiff was "exposed to asbestos dust in any manner other than by virtue of [his] employment by [d]efendant." Defense counsel stated he had the following concern:

> "I expect [plaintiff's attorneys] will present evidence that not only
> was their client exposed to asbestos from [defendant], but from
> neighboring [UNARCO], and this would appear to potentially
> touch on that. If it means—if this motion means talking about dust
> while [plaintiff] worked at [UNARCO], that's a different issue ***
> as to Mr. Smith and as to—"

Plaintiff's counsel then interjected that plaintiff worked at UNARCO for a short period of time and then for defendant's predecessor, the Gulf Mobile & Ohio Railroad (GM&O). No one disputes defendant is responsible for GM&O's actions. According to plaintiff's counsel, defendant denied plaintiff was sick from asbestos exposure, not that UNARCO was the sole proximate cause of plaintiff's asbestosis. Plaintiff's counsel argued plaintiff was exposed to dust as a result of the use of asbestos products at the rail yard. This included exposure to dust from the UNARCO facility. GM&O knew asbestos was being used at the UNARCO facility, knew

asbestos dust was blowing into the area where plaintiff was working, and knew its employees were complaining about the dust and did nothing to protect them. According to plaintiff, this was a breach of defendant's duty pursuant to the Federal Employers' Liability Act (FELA) (45 U.S.C.A. §§ 51-60) to provide its employees a safe place to work. Plaintiff argued his employment at UNARCO was not at issue, only his exposure to asbestos—including dust from the UNARCO facility—while working for defendant. After plaintiff's counsel stated plaintiff's UNARCO work history could not be mentioned pursuant to the motion *in limine*, defense counsel objected, arguing "[t]he jury could reasonably find that if [plaintiff] has disease, it could have been caused by what could have likely been more extensive exposure at [UNARCO]." The trial court allowed the motion *in limine* "in the absence of any evidence as to sole proximate cause."

¶ 5         The trial court also heard arguments with regard to defendant's motion *in limine* to exclude evidence regarding the existence of the lease between defendant and UNARCO and related evidence. Defendant argued it had no duty to control UNARCO's activities on the leased property. Therefore, defendant's status as UNARCO's landlord was not relevant. According to defendant, "By allowing the lease in, the jury could reach the conclusion that the railroad was somehow negligent as a landlord." Defendant argued the lease was more prejudicial than probative of the issues in the case and should be excluded.

¶ 6         Plaintiff's counsel argued this evidence should not be excluded. According to plaintiff's counsel, plaintiff would not argue defendant should have controlled what went into the UNARCO facility and what occurred inside the facility. However, defendant had a responsibility to deal with the dust after it left the UNARCO facility. Further, the lease and other

evidence defendant sought to exclude showed the railroad knew UNARCO would be working with asbestos at the rail yard. The trial court denied the motion *in limine* with regard to the lease.

¶ 7 After the first jury was selected in October 2013, the trial court declared a mistrial after two jurors were dismissed for cause. In January 2014, a new jury was selected, and the trial began.

¶ 8 Plaintiff called Lyndle R. Burton, defendant's manager of industrial hygiene, as an adverse witness. Burton testified both defendant and GM&O were likely using asbestos products in the 1930s and 1940s. He was unsure if they were actively involved in using asbestos in the 1950s. However, he testified asbestos was everywhere in the 1950s and 1960s.

¶ 9 Burton testified asbestos is toxic, and he knew of no cure for asbestosis. Scarring from asbestosis is permanent and can be fatal at a severe level. He testified the scarring can get worse, specifically depending on whether the individual smokes. Burton acknowledged the primary cause for asbestosis is asbestos. However, he testified he has seen articles—which he could not identify—indicating the severity of asbestosis is linked to smoking. He conceded someone cannot get asbestosis from just smoking.

¶ 10 Burton acknowledged testifying in 2006 defendant knew in the 1930s the use of asbestos in its shops was hazardous. However, he further testified, "After I've had a chance to look further at the documents I was being questioned on, instead of just one page, I have no belief that they knew that there was a hazard of asbestos." According to Burton, neither defendant nor GM&O knew in the 1930s the use of asbestos in their shops was potentially hazardous. He admitted defendant knew asbestos could cause asbestosis in the 1930s, but it was not concerned about a potential risk to its employees because of the lower dust levels at railroad shops compared with occupations with greater exposure.

¶ 11		The trial court allowed plaintiff to question Burton on a document from a 1935

meeting of the Association of American Railroad Proceedings in Atlantic City, New Jersey, over

defendant's objection no one from GM&O was present at the meeting.  The document showed

defendant was represented at the meeting.  The document included a report by the Committee on

Disability and Rehabilitation, which included an entry on pneumoconiosis.  The report talked

about silicosis and asbestosis.  According to the report, asbestosis was not a common condition

but caused extensive pulmonary fibrosis.  The report noted a patient's history is very important in

making an early diagnosis.  The report recommended educating all concerned, getting rid of

asbestos dust, having employees wear inhalers, and analyzing the dust content of the air at

different times during working hours.  Burton disagreed with plaintiff's assertion the report

reflected a concern by railroad physicians that employees were at risk of getting asbestosis and

silicosis.   Burton believed the concern of the report was exposure to silica.

¶ 12		Over defendant's objection, the trial court also allowed plaintiff to introduce a

1937 circular from the General Managers Association of Chicago, which purportedly went to all

railroads operating in Illinois.  The circular included suggested recommendations to be observed

by employees handling asbestos.  The circular stated:

> "It is suggested that any instructions you may want to give be
>
> communicated verbally direct to the foremen or such others who
>
> may be responsible and they not be placed in written form upon
>
> bulletin boards, et cetera, where any publicity may become
>
> attached to that."

According to the document, respirators should be furnished by the company and orders issued

for employees to wear respirators any time they are handling asbestos; the asbestos should be

sprayed down with water to help control dust; and asbestos insulation should be removed at night, when the least number of men would be working in the vicinity.

¶ 13        Charles Garrett, the risk mitigation manager for defendant, testified he deals with lung disease claims, the majority of which involve asbestos exposure. Garrett provided some background information with regard to who had operated the Bloomington rail yard. According to defendant, Chicago and Alton Railroad operated rail yards from 1869 until 1947, when GM&O purchased the assets of Alton Railroad. Garrett testified Chicago and Alton Railroad and Alton Railroad were the same basic entity. In 1947, GM&O took over the Bloomington rail yard. Garrett testified defendant and GM&O merged in August 1972.

¶ 14        During Garrett's testimony, plaintiff moved to introduce the 1951 lease agreement between GM&O and UNARCO. Defendant's objection was overruled, and the trial court granted defendant's request for a continuing objection with regard to the lease and documents related to the lease. Garrett testified that by 1951 defendant knew of the hazards of asbestos. The following exchange then occurred over defendant's objection:

"[Plaintiff's Counsel]: Mr. Garrett, do you agree that bringing asbestos to Bloomington was not in the general welfare of the community if they knew it could cause disease?

[Garrett]: I think based on what we know today it was not a wise decision.

[Plaintiff's Counsel]: Okay. Are you aware of anything that the railroad did in connection with UNARCO to gain knowledge about the asbestos operations there?

[Garrett]: I know there is a letter \*\*\* that the president of
UNARCO sent to somebody that said they were going to do
fiberglass and asbestos insulation. I think the fiberglass part would
have been okay, but today I don't think the asbestos was a wise
decision.

[Plaintiff's Counsel]: And even—of course today, I, you
know, understood, but I'm asking even back in '51 when the
railroad was in court representing that this would be something that
would promote the interests and the general welfare of the
community, there is no dispute that the railroad knew at that time
that exposure to asbestos could cause disease. True?

[Garrett]: Correct."

Garrett also testified GM&O clearly knew UNARCO was going to make asbestos insulation in
the leased facility.

¶ 15        At the end of Garrett's examination by plaintiff's counsel, defendant moved for a
mistrial based on the testimony concerning the lease between GM&O and UNARCO. Defense
counsel argued:

"The testimony came in quite clearly attempting or at least creating
an inference that the railroad acted [i]nappropriately or negligently
or somehow wrongfully in obtaining UNARCO as a lessee. This
was supposed to, the whole idea of having this was as to notice and
now it's a whole new level of liability that has been created with

the jury based upon the amount and the type of evidence and the questions that were asked."

The trial court stated it believed the evidence went to the issue of notice and denied the motion for a mistrial.

¶ 16        Dr. Alan Ginzburg, a board-certified physician in internal, pulmonary, and critical care medicine, testified the major diseases associated with asbestos exposure include asbestosis, lung cancer, and mesothelioma.   In addition, Ginzburg testified asbestos exposure can cause pleural plaques and benign asbestos pleural effusions.  According to the doctor's testimony, no way exists to determine which specific day of asbestos exposure or which specific asbestos fiber caused an asbestos-related disease.  The more exposure to asbestos an individual experienced the greater the likelihood of a resulting disease.  When asked about the phrase "neighborhood disease," Ginzburg testified:

> "[I]f you have an area where there's heavy asbestos use, such as an asbestos plant, there is a zone around the plant where there are asbestos fibers present in the air.  And anybody living in that zone would be exposed to asbestos.  The highest risk are the people who actually work in the plant, and the further you get away from there, your risk gets lower.  However, we often see—we often see families, entire families, that are exposed to—that have asbestos-related disease even though they didn't work in the plant, because the worker who was heavily exposed to asbestos walks out—walks home or goes home at the end of the day, and they're covered— their clothes are covered with the asbestos.  And they come into

the house, and then the house becomes an asbestos zone. And so families of people who have been exposed to asbestos in that way become at risk for developing asbestos-related disease."

Dr. Ginzburg testified he had treated individuals with asbestos-related diseases who never worked directly with asbestos but lived in the neighborhood of the UNARCO plant in Bloomington.

¶ 17 Dr. Ginzburg testified plaintiff was one of his patients. In Ginzburg's opinion, plaintiff had asbestosis and pleural plaques, both permanent diseases, caused by asbestos exposure. Ginzburg testified asbestosis can be a progressive disease and fatal. Ginzburg opined plaintiff's three years of exposure to asbestos working for the railroad was likely enough exposure to cause his asbestosis, pleural plaques, and lung disease.

¶ 18 Outside the presence of the jury, defendant examined Dr. Ginzburg as part of an offer of proof. Ginzburg testified plaintiff's work history included employment at the UNARCO facility. Ginzburg testified everyone who worked at UNARCO had asbestos exposure. Ginzburg did not know if he had treated any other former railroad worker who had asbestosis. Ginzburg testified it was possible within a reasonable degree of medical certainty for plaintiff's asbestos exposure at UNARCO to be sufficient to cause his plaques and asbestosis. The following exchange then occurred between plaintiff's counsel and Dr. Ginzburg:

"[Plaintiff's Counsel]: Just so we're clear. If he's got exposure at the railroad, if he's got exposure because he works for the railroad next to the asbestos plant, if he's got exposure at the asbestos plant, if he's got exposure somewhere else, is it all of the exposures that are implicated as causes?

[Dr. Ginzburg]: Yes.

[Plaintiff's Counsel]: None of them are the sole cause.

[Dr. Ginzburg]: No. It's like asking with—you know, if somebody smoked cigarettes for 30 years, is it the cigarettes that he smoked in the first 20 years that caused his lung cancer or is it the last 10 years? It's a cumulative effect."

¶ 19 Michael McGowan testified he began working for GM&O in Bloomington in May 1959. He then worked for defendant until 1994. McGowan stated everyone knew the pipe insulation at the rail yard contained asbestos, but the railroad never told anyone the asbestos could be harmful. Other than pipe insulation, McGowan testified asbestos products at the rail yard included brake shoes, asbestos sheets, packing, and gaskets.

¶ 20 According to McGowan, the UNARCO building would easily cover a football field. During the majority of his career working at the Bloomington rail yard, he did not see dust blowing out of the building. However, the UNARCO workers would have dust on them.

¶ 21 Robert Winstead testified he saw material blowing out of the UNARCO building and around the rail yard when he worked at the Bloomington rail yards in the 1950s. Winstead described the dust as sometimes being like a "snow storm." Winstead testified he could see dust in the air in the UNARCO building. This was during the 1950s and 1960s. According to Winstead, because it was so dusty inside, people could not be seen walking around inside the UNARCO building.

¶ 22 Dr. Arthur Frank, in a videotaped evidentiary deposition played for the jury, testified he is a physician licensed to practice medicine and also has a Ph.D. in biomedical sciences. Dr. Frank stated the original research he did for his Ph.D. thesis concerned the effects

of asbestos on respiratory tissue.  Dr. Frank testified he is employed by Drexel University and has a number of positions with the University, including but not limited to professor of public health, chair of the department of environmental and occupational health, and professor of medicine in the department of internal medicine, specifically in the pulmonary division. According to Dr. Frank's testimony, asbestosis can be a fatal disease.

¶ 23        Dr. Frank stated asbestosis is not a disease you see in the general population.  No one will get asbestosis unless they are exposed to a significant amount of asbestos.  According to the doctor:

> "[A]sbestos is a naturally occurring material.  Everyone, everybody in our room today, everybody watching this videotape, everybody has some asbestos in their lungs.  Does that mean they're all going to get disease?  Absolutely not.  We are all exposed to hazardous materials all the time.  Every time you go fill up your gas tank on your car, you fill it up with gasoline.  There's a little bit of benzene in there.  That doesn't mean we're all going to get leukemia from benzene.  But we have the potential for exposure.  ***
>
> So this goes back to the concept of dose-response.  For most individuals, the dose is very low.  The risk of disease is very low.  But as the amount of exposure goes up, the risk goes up. And the other point that needs to be made, to produce certain of the diseases that we talked about, like asbestosis, it takes relatively a lot of asbestos.  Not everybody with any exposure could

necessarily develop asbestos[is]. There's a threshold. Nobody really knows what that number is. People have tried putting numbers on it and it—it varies greatly depending on which scientist looks at it, but everybody agrees in principle that to get asbestosis, you need a lot of exposure, but whatever exposure it takes to give you asbestosis, you certainly have not had enough exposure to get and be at a higher risk for getting any of the cancers."

Plaintiff's counsel then asked Dr. Frank whether science has determined what a safe level of asbestos exposure is, to which the doctor responded:

"There's only one safe level, and that is zero. For every cancer-causing agent, the only safe level is zero. Again, very small amounts carry very small risk. But the basic principle is the only safe level of a cancer-causing agent, not just asbestos, but benzene—the American Petroleum Institute wrote in 1948 that for benzene, the only safe level was zero. And we could go on and on. But for a cancer-causing agent, the only safe level is zero."

Later, during his cross-examination by defense counsel, Dr. Frank clarified his testimony stating: "There's no known safe level and it's treated as if there's no safe level."

¶ 24 Plaintiff's counsel then asked how it can be determined what day, week, or month's exposure to asbestos caused a patient's asbestos-related disease. Dr. Frank responded that all of a patient's exposures caused the patient's disease because the diseases are "cumulative diseases." Dr. Frank explained:

"[W]hatever exposure you have on a given day and then another day and a third day, they all add up, especially with something like asbestos where some of it will get in the lungs and stay there for the rest of your life. Other cancer-causing agents like benzene and others are metabolized by the body and the body manages to get rid of them, but asbestos stays there on a pretty permanent basis.

And everybody when they die will have some asbestos in their lung. And how much you have will depend on how much you were exposed to over the years. So it is this addition day after day after day of a cumulative nature, the totality of what you're exposed to that is said to cause whatever disease you develop."

Plaintiff's counsel and Dr. Frank also discussed frequency of asbestos exposure:

"[Plaintiff's Counsel]: In terms of the frequency with which somebody has to be exposed to asbestos in order to be at risk, is there any minimum there that's been determined by science?

[Dr. Frank]: Well, one day for cancers. And Dr. Selikoff has shown that even two or three months may be enough to give some people asbestosis."

¶ 25    Plaintiff's counsel also asked Dr. Frank about reentrainment, to which Dr. Frank replied:

"[Dr. Frank]: Reentrainment means that fibers that are brought in that may settle down, that if you walk by, if you start

- 13 -

shaking out clothes, if a wind gust is blowing, it's put back up in the air so people can breathe it. That's what's called reentrainment. It's put back in the air so you can inhale it.

[Plaintiff's Counsel]: If a worker is working with asbestos products or if he's exposed to asbestos from another source, asbestos is drifting into his workplace from some other place that's letting off asbestos, if he's exposed to that in June and he takes it home on his clothes, will that exposure continue on in the coming months and years if it's in his house?

[Dr. Frank]: He'll be exposed—if it's gotten into his home and his car, he'll be—he'll be exposed the next June and the June after that, as long as the asbestos is there and not properly cleaned up."

Plaintiff then asked about the efficacy of cleaning up asbestos fibers with a household vacuum cleaner in the period between the 1940s and the early 1970s.

[Dr. Frank]: They'd suck it in one end and it would blow out of the other end given the kind of vacuum cleaners they had in those days. ***

[Plaintiff's Counsel]: So once it's in—and if somebody worked at a facility where asbestos fibers were released as a result of products in the facility or from some other building near it, if the workers in that facility tried to sweep up or tried to clean at the end of the day or end of the week, what effect would that have?

- 14 -

[Dr. Frank]: Well, depending on how they would just sweep it up, they'd put it back in the air. They breathed it. It would get on their clothing and they'll take it off site with them unless they had a change of clothes or wore coveralls that they left at work, took a shower to get it out of their hair. It'll leave the work site with them and go home.

[Plaintiff's Counsel]: So if it's in a workplace or if it's in a home, once it's there, how regularly is the worker exposed—

[Dr. Frank]: Pretty much every day."

¶ 26       On cross-examination, Dr. Frank testified he had not been given any medical records in this case.

¶ 27       Plaintiff testified he went to work for the railroad in 1955 and worked there for three years. He worked at the "wheel and axle" shop and in the storeroom. According to plaintiff, he did not know what asbestos was while working for the railroad and did not know he was working around any asbestos-containing products. After working at the wheel and axle shop, he worked at the scrap dock sorting metal and brake shoes. He testified he also helped clean parts of the rail yard by sweeping up dust with a push broom. In addition, plaintiff helped move items from the roundhouse to the train depot. According to his testimony, the railroad never provided him with a respirator, and he never saw anyone wearing a respirator.

¶ 28       As to his health, plaintiff testified he was afraid he was going to get cancer. He stated he thought about it every day.

¶ 29       On cross-examination, plaintiff testified close to 100% of his time working at the railroad was outside. On redirect, plaintiff testified he was usually in the area of the UNARCO

facility. In an offer of proof outside the presence of the jury, the parties agreed plaintiff worked at UNARCO for three months in 1954. Further, plaintiff left UNARCO because it was dirty.

¶ 30 After plaintiff rested, defendant made a motion for a directed verdict, which the trial court denied.

¶ 31 Among other witnesses defendant called, Duane Amato, an industrial hygienist, testified dose could be the most important concept with regard to industrial hygiene. According to Amato:

> "[D]ose equals concentration times the time. So you can be exposed to the material but if the concentration or the duration is not significant, then there is no effect. It's—you could use dose for anything. Bacon. In our food. We know a lot of—I mean we read the paper, you see that oh jeez this causes this or red wines causes this or you have benzene in gasoline, you have nitrates in bacon. Well they could be carcinogens, and nitrates are, and they are in bacon and we eat this stuff. All right? But we don't have three pounds of bacon every day for our lifetime. So we can't get alarmed every time we see that something is a carcinogen. You can't get alarmed if we go out and get our mail from the mailbox and it's a bright sunny day and we are exposed to ultraviolet. So dose is really important, all right? Even with sunlight, the recommendations are you wear sun screen because you don't want a great deal of sun on unexposed skin over your lifetime. So

everything is dose related. Everything can be toxic. So dose is a

really, really critical area."

With regard to asbestos, Amato testified mesothelioma can result from smaller levels of asbestos exposure than asbestosis. According to Amato, "[t]he vast weight of evidence shows" mesothelioma can occur after approximately five fiber years of asbestos exposure. As for asbestosis, Amato testified "the vast majority of studies, vast majority of regulators, consultants, experts in the field" would say asbestosis does not occur absent asbestos exposure of 25 fiber years. However, on cross-examination, Amato conceded no one knows asbestos disease is only caused by a minimum of five fiber years of asbestos exposure. According to Amato:

"I agree that the studies, vast majority of the studies say five fibers.

Is it 4.8? Nobody knows that. Is it 4.6? Nobody knows that. Is it

5.2? I'm just saying that the vast majority of the studies *** are

saying five fiber years. The weight of the evidence. But nobody

can tell you it's 4.65."

¶ 32 Amato testified it was his opinion within a reasonable degree of industrial hygiene certainty that GM&O provided plaintiff with a reasonably safe place to work. According to Amato, he based his opinion on:

"the kinds of things that were going on at GM&O. I base that on—

I base that on not only the types of things that were happening,

what they were doing, I base that on the fact that some of the

individuals were working outside where you have ventilation, it's

better than any ventilation you'll find inside of an operation."

With respect to why it was a safe environment with regard to asbestos exposure, Amato stated:

"Because you do not expect any levels of significance in those areas. I think Mr. McGowan said that there was no asbestos in the wheel and axle shop. He didn't see it. And quite frankly the major use of asbestos in the railroad industry was when they had steam locomotives and [plaintiff] was not working with steam locomotives."

Further, with regard to how distance from asbestos affects exposure rates, Amato offered the following example with regard to an individual three feet away from asbestos:

"[L]et's say you have an individual who is sweeping, let's say sweeping up some asbestos scrap. And that level is at 10, 10 fibers which is a very very high level. Well if you move back to six feet you quarter the exposure so now you're at 2.5, all right? And then you double that distance again so you go out to twelve feet, yeah, half of twelve, then it would be what, point eight? And then you come back and by the time you're at fifty feet you're back to background levels."

The trial court sustained plaintiff's objection based on nondisclosure when defense counsel asked Amato: "Do you have an opinion within a reasonable degree of industrial hygiene certainty as to what [plaintiff's] dosage would be to asbestos based on his description of his work career?"

¶ 33     The following exchange occurred during plaintiff's counsel's cross-examination of Amato:

"[Plaintiff's Counsel]:  We saw an exhibit before you got

here from a study that Owens Corning took in the summer of 1970

and did some dust counts inside the [UNARCO] plant?

[Amato]:  Yes.

***

[Plaintiff's Counsel]:  The amounts that were being emitted

into the air where it was being measured inside that plant were

horrendous.  Do you agree?

[Amato]:  They were, in terms of the—the person who did

the sample, I think he said they were unbelievably bad."

In an offer of proof, Amato testified, based on his review of plaintiff's deposition, he determined

plaintiff worked at UNARCO for a little less than one year.  Based on the level of exposure at the

UNARCO plant, plaintiff would have received an asbestos exposure greater than 25 fiber years,

"depending on his job."

¶ 34          Defendant presented the testimony of other witnesses, but we need not address

their testimony here for purposes of this appeal.  The jury ultimately found for plaintiff, and the

trial court entered judgment for plaintiff against defendant.

¶ 35          This appeal followed.

¶ 36                              II. ANALYSIS

¶ 37                    A.  Defendant's Motion for a Directed Verdict

¶ 38          We first address defendant's argument the trial court erred in denying its motion

for a directed verdict. A motion for a directed verdict should only be granted when the evidence

presented, viewed in a manner most favorable to the nonmoving party, is so overwhelmingly in

the movant's favor no contrary verdict based on the evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967). In ruling on a motion for directed verdict, a trial court "may only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion." *Maple v. Gustafson*, 151 Ill. 2d 445, 453, 603 N.E.2d 508, 512 (1992). Based on this standard, the trial court clearly did not err in denying defendant's motion for a directed verdict.

¶ 39 According to defendant, the evidence overwhelmingly established it was not negligent. Defendant agues FELA imposes a general duty on railroads to use ordinary care to provide a reasonably safe workplace. This court has stated "the standard of proof is lower in a FELA case, [but] FELA is not an insurance statute." *Myers v. Illinois Central R.R. Co.*, 323 Ill. App. 3d 780, 787, 753 N.E.2d 560, 566 (2001). Defendant argues:

"Plaintiff failed to present any evidence that [defendant] was negligent. In fact, the evidence overwhelmingly established that the alleged injury to [plaintiff] was not foreseeable to the railroad. Plaintiff presented no evidence concerning the level of airborne asbestos to which [plaintiff] was allegedly exposed while employed by defendant, much less evidence of any alleged exposure of sufficient dosage that would make injury foreseeable to [d]efendant. Plaintiff made no attempt to quantify [plaintiff's] alleged exposure at the Bloomington railroad facility and no witness testified or opined that [plaintiff's] railroad work was not reasonably safe. Without evidence from which the jury could conclude that [plaintiff] was exposed to asbestos in amounts that

- 20 -

would make injury foreseeable to [d]efendant, [d]efendant cannot

be deemed to have been negligent."

¶ 40      We disagree with defendant.  Based on the evidence presented in this case, the evidence—when viewed in plaintiff's favor—and the inferences that can be drawn from that evidence clearly did not overwhelmingly support a verdict in defendant's favor.  For purposes of a motion for a directed verdict, the trial court would have had to infer GM&O knew the danger asbestos posed to those working around it when plaintiff was working at the rail yards in the 1950s.

¶ 41      With regard to the dose of asbestos plaintiff was exposed to at the rail yards, plaintiff presented a witness who testified workers at the rail yard were exposed to large amounts of dust from the UNARCO facility and worked with products containing asbestos.  Plaintiff also presented evidence GM&O knew UNARCO was going to be working with asbestos at the Bloomington rail yard facility.  Further, the evidence regarding what caused plaintiff's asbestosis was sufficiently tied to his work at the rail yard to survive a motion for a directed verdict.

¶ 42                          B.  Evidentiary Issues

¶ 43      Defendant makes a series of arguments regarding the trial court's evidentiary rulings.  Ordinarily, we review a trial court's decision to admit evidence under an abuse-of-discretion standard of review.  *Kim v. Mercedes-Benz, U.S.A., Inc.*, 353 Ill. App. 3d 444, 452, 818 N.E.2d 713, 720 (2004).  For purposes of this decision, we need only address the evidentiary issues concerning the operations of the UNARCO facility and plaintiff's employment at UNARCO.

¶ 44      Defendant argues the trial court abused its discretion by admitting evidence of the lease agreement between GM&O and UNARCO and other related evidence.  Defendant also

argues the trial court abused its discretion by not allowing it to introduce evidence plaintiff worked at the UNARCO facility for a three-month period prior to working for the railroad and quit working for UNARCO because the work was dirty. We disagree with defendant on the first point but agree on the second.

¶ 45        We first address defendant's argument the trial court abused its discretion by admitting evidence of the UNARCO lease agreement and UNARCO's operation at the rail yard. Defendant argues this evidence was irrelevant and extremely prejudicial to defendant. According to defendant:

> "Such evidence included, but was not limited to, testimony regarding [defendant] seeking out a desirable tenant for the property, asbestos dust being emitted from the UNARCO plant, testimony from a former UNARCO employee regarding working conditions at the plant, and lease documents ***. The evidence was not only irrelevant, but also severely prejudicial because the conduct of UNARCO was improperly imputed to [d]efendant."

Defendant argues it cannot be held responsible for any conduct of its tenant UNARCO because as a landlord it relinquished possession and control of its premises to UNARCO.

¶ 46        Defendant argues a landlord owes no duty to control the operations of its tenant. However, defendant's reliance on landlord-tenant law is not relevant to the theory of liability in this case. Plaintiff was not arguing defendant had to control UNARCO's activities at the facility. The lease and related evidence regarding UNARCO's operation were relevant because they related to defendant's knowledge of UNARCO's operation and the potential effects it could have on defendant's employees who were working in close proximity to the UNARCO plant.

¶ 47        Defendant also argues this evidence was confusing to the jury and prejudicial to defendant because of the "notoriety of the UNARCO plant in the Bloomington community." However, this argument amounts to mere speculation and conjecture. Defendant points to nothing in the record supporting this argument.

¶ 48        Defendant also argues the trial court erred by allowing testimony from former employees who worked at neither UNARCO nor the railroad at the same time as plaintiff. On this point, plaintiff argues the trial court did not abuse its discretion in allowing the testimony because the difference in job title and the discrepancy of time of employment would go to the weight of the evidence, not its admissibility. We agree. Further, as plaintiff points out, defendant's corporate representative testified defendant's operations were the same during this entire period. Further, defendant argues the trial court erred by prohibiting defendant from questioning these witnesses regarding their lawsuits against defendant and their representation by plaintiff's counsel to show bias and lack of credibility. However, we do not find the trial court abused its discretion in not allowing these questions as it would have opened the door to the nature of the witnesses' claims against defendant.

¶ 49        We next address defendant's argument the trial court erred in excluding evidence plaintiff worked at the UNARCO facility at the Bloomington rail yard prior to working for the railroad. Defendant makes a two-pronged argument. First, defendant argues the court erred in granting plaintiff's motion *in limine* barring defendant from introducing this evidence. Second, according to defendant, the court erred in not allowing this evidence after plaintiff's opening statement detailed his entire work history except his employment at the UNARCO facility. According to defendant:

"Excluding evidence of plaintiff's significant exposure to asbestos while working at UNARCO in effect stripped [d]efendant of its defense of sole proximate cause which [d]efendant properly and timely asserted at the onset of the case. Defendant was entitled to have the jury consider [plaintiff's] asbestos exposure at UNARCO. Defendant conceded [plaintiff] had pleural plaques—a marker for asbestos exposure—but the jury could have reasonably found that the sole proximate cause of those plaques was the massive dose of asbestos exposure he sustained while working at UNARCO, as opposed to the minimal dose he may have received while working at GM&O."

¶ 50 However, plaintiff argues the trial court did not err in excluding evidence of plaintiff's short work history at UNARCO. According to plaintiff:

"So called 'other exposure evidence,' in the context of an asbestos case, is relevant *only* if the defendant mounts a sole proximate cause defense. *Nolan v. Weil-McLain*, 233 Ill. 2d 416 (2009). Otherwise, 'evidence that another's negligence might also have been a proximate cause is irrelevant—and therefore properly excluded—if introduced for the purpose of shifting liability to a concurrent tortfeasor.' *Id.* at 437-38."

Plaintiff first argues defendant sought to introduce this evidence "only as a means to shift the blame to a concurrent tortfeasor." From the record, it does not appear defendant was trying to shift blame to a concurrent tortfeasor. Instead, defendant was trying to cast doubt on plaintiff's

assertion defendant was a proximate cause of plaintiff's asbestosis by informing the jury plaintiff had significant asbestos exposure before he worked for the railroad.

¶ 51    In addition, without citing any authority in his brief, plaintiff argued defendant never had a sole proximate cause defense because:

"A sole proximate cause defense, by definition, is an admission of the plaintiff's injury.  Otherwise, how can [d]efendant claim [plaintiff's] exposure to asbestos at UNARCO is the sole proximate cause of his asbestosis when [d]efendant does not even acknowledge [plaintiff] has asbestosis?"

Plaintiff provides no authority for the proposition a defendant must concede a plaintiff has an asbestos-related disease before it can present a sole proximate cause defense.  In fact, plaintiff's argument would improperly ease a plaintiff's burden of proof.  Illinois case law states:

"In a cause of action for negligence or strict product liability arising from alleged exposure to asbestos, a plaintiff must prove that the defendant's asbestos was the cause in fact of the injury.  [Citation.]  To prove causation in fact, the plaintiff must prove medical causation, *i.e.*, that exposure to asbestos caused the injury, *and* that it was the defendant's asbestos-containing product which caused the injury.  [Citation.]"  (Emphasis added.)  *Zickuhr v. Ericcson, Inc.*, 2011 IL App (1st) 103430, ¶ 36, 962 N.E.2d 974.

See also *Johnson v. Owens-Corning Fiberglas Corp.*, 313 Ill. App. 3d 230, 235, 729 N.E.2d 883, 887 (2000).  We see no reason why defendant could not challenge plaintiff's evidence regarding medical causation and also challenge plaintiff's claim his exposure at the railroad was the

proximate cause of his injury, assuming the trier of fact found plaintiff met his burden with regard to medical causation. Plaintiff's counsel essentially dropped this claim during oral arguments.

¶ 52        Instead, during oral arguments, plaintiff's counsel claimed defendant could not pursue a sole proximate cause defense because he had no expert witness who could testify plaintiff's asbestos exposure while working for the railroad was not a proximate cause of plaintiff's asbestosis. This argument goes to plaintiff's statement in his brief that "[a]ny attempt by [d]efendant to bring up [plaintiff's] exposure at UNARCO would just be an attempt to shift the blame to a concurrent tortfeasor, not to *prove* a sole proximate cause defense." (Emphasis added.)

¶ 53        As our supreme court noted in *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 93, 658 N.E.2d 450, 455 (1995):

> "A person *who is guilty of negligence* cannot avoid responsibility
>
> merely because another person is guilty of negligence that
>
> contributed to the same injury. *** Thus, evidence of another
>
> person's liability is irrelevant to the issue of defendant's guilt."
>
> (Emphasis in original.)

However, this "principle presumes that a defendant's conduct is at least *a* proximate cause of the plaintiff's injury." (Emphasis in original.) *Id.*

¶ 54        Like in *Leonardi*, defendant in this case denied its actions were a proximate cause of plaintiff's alleged asbestosis. The supreme court in *Leonardi* stated:

> "Plaintiffs insist that defendants' general denial of
>
> negligence is insufficient to raise the sole proximate cause defense.

Plaintiffs maintain 'that defendants should be required to plead sole proximate cause of a non-party as an affirmative defense.'

This contention is erroneous. In any negligence action, the plaintiff bears the burden of proving not only duty and breach of duty, but also that defendant proximately caused plaintiff's injury. [Citations.] The element of proximate cause is an element of the *plaintiff's* case. The defendant is not required to plead lack of proximate cause as an affirmative defense. [Citation.] Obviously, if there is evidence that negates causation, a defendant should show it. However, in granting the defendant the privilege of going forward, also called the burden of production, the law in no way shifts to the defendant the burden of proof." (Emphasis in original.) *Id.* at 93-94, 658 N.E.2d at 455.

In addressing the plaintiff's argument "the sole proximate cause defense distracts a jury's attention from the simple issue of whether a named defendant caused, wholly or partly, a plaintiff's injury," the supreme court stated:

"We disagree. The sole proximate cause defense merely focuses the attention of a properly instructed jury *** on the plaintiff's duty to prove that the defendant's conduct was a proximate cause of plaintiff's injury." *Id.* at 94, 658 N.E.2d at 456.

¶ 55 In *Nolan v. Weil-McLain*, 233 Ill. 2d 416, 910 N.E.2d 549 (2009), the supreme court made clear its reasoning in *Leonardi* applied in asbestos cases. The plaintiff in *Nolan* alleged he was exposed to asbestos by the defendant, Weil-McLain, when he installed, repaired,

or removed boilers manufactured by the defendant. *Id*. at 419, 910 N.E.2d at 550. The other named defendants in the case had settled or been dismissed, which meant defendant was the sole defendant at trial. *Id.* Relying on *Leonardi*, the defendant sought to present evidence the sole proximate cause of the plaintiff's death was his exposure to asbestos-containing products of non-party entities. *Id*. at 420, 910 N.E.2d at 551.

¶ 56    The plaintiff, however, sought to bar all evidence of decedent's exposure to asbestos products of nonparties, arguing it was irrelevant, highly prejudicial, and would confuse the jury. *Id*. The plaintiff argued:

> "it was impossible to determine the specific fiber or asbestos
>
> exposure that caused decedent's mesothelioma, and, at best,
>
> defendant could show only concurrent causation of decedent's
>
> injury. Plaintiff also maintained that other-exposure evidence was
>
> not necessary for defendant to establish its defense that the amount
>
> of asbestos decedent inhaled while working with its products could
>
> not have caused his mesothelioma." *Id.*

However, the defendant countered, "because it was the sole defendant, a jury would not accept a low-dose defense without evidence of other asbestos exposures, and that if the evidence showed that its products were decedent's only exposure, a jury could find that its products caused his mesothelioma." *Id.* The issue before our supreme court was whether the trial court erred by excluding "all evidence of decedent's exposure to asbestos throughout his 38-year career from products" made by other manufacturers. *Id.* at 428, 910 N.E.2d at 555.

¶ 57    The supreme court noted it was undisputed the plaintiff died of mesothelioma. *Id*. at 421, 910 N.E.2d at 551. Further, it was undisputed that "prior to 1974 various asbestos-

containing components were supplied with defendant's boilers, including cement and rope

manufactured by other entities." *Id.*

¶ 58      The plaintiff argued "that asbestos cases are 'completely unlike' other tort cases, in

that 'they call for different rules of proof,' evinced by the 'presumption' of causation established

by this court in *Thacker* [*v. UNR Industries, Inc.*, 151 Ill. 2d 343, 603 N.E.2d 449 (1992)]." *Id.*

at 429, 910 N.E.2d at 555-56.  As a result, the plaintiff requested the supreme court " 'recognize

an exception to the rule set forth in *Leonardi*' [(relating to a sole proximate cause defense)] for

asbestos actions." *Id.* at 429, 910 N.E.2d at 556.  The supreme court disagreed with the plaintiff

on both of these points. *Id.*

¶ 59      In discussing its decision in *Thacker*, our supreme court stated it "considered

whether the circuit court erred in denying a defense motion for judgment *n.o.v.* because the

plaintiff failed to produce sufficient evidence of exposure to defendants' asbestos." *Id.* at 430,

910 N.E.2d at 556.  In holding the trial court's denial of the defendants' motion in *Thacker* was

correct, the court noted it "detailed the proper analysis to be used in determining whether a

plaintiff has satisfied the burden of proof at trial." *Id*.  According to the court:

> "We began by reciting the 'general rule in civil cases' that a
>
> plaintiff bears the burden of producing evidence sufficient to
>
> establish each element of the claim.  [Citation.]  We explained that
>
> a plaintiff meets the burden of production with regard to a given
>
> element of proof 'when there is some evidence which, when
>
> viewed most favorably to the plaintiff's position, would allow a
>
> reasonable trier of fact to conclude the element to be proven,' and
>
> cautioned that '[w]hile circumstantial evidence may be used to

show causation, proof which relies upon mere conjecture or speculation is insufficient.' [Citation.]

Focusing upon the specific element of causation, we observed that 'causation requires proof of both "cause in fact" and "legal cause." ' [Citation.] Because the parties in *Thacker* disputed whether the plaintiff had established the defendants were a 'cause in fact' of the decedent's injuries, we noted that there are generally two tests used by courts to determine cause in fact: the traditional 'but for' test, where 'a defendant's conduct is not a cause of an event if the event would have occurred without it'; and the 'substantial factor' test, where 'the defendant's conduct is said to be a cause of an event if it was a material element and a substantial factor in bringing the event about.' [Citation.]

\*\*\*

*Thacker* noted that because 'unique problems [are] posed by asbestos injury,' courts 'have struggled with how a plaintiff in an asbestos case can fairly meet the burden of production with regard to causation.' [Citation.] Surveying the varying approaches taken in jurisdictions throughout the country, we observed that the United States Court of Appeals for the Fourth Circuit in *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir. 1986), had fashioned a rule derived from section 431 of the Restatement (Second) of Torts—and which had been adopted in several other

jurisdictions—to determine whether sufficient evidence of cause in fact has been presented to allow a case to go to the jury. [Citation.]" *Id.* at 430-32, 910 N.E.2d at 556-57.

The court noted the Fourth Circuit in *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir. 1986)) criticized a rule that would allow a plaintiff to avoid a directed verdict on the issue of cause by presenting any evidence of mere proximity to the defendant's asbestos-containing product as contrary to the law of substantial causation. *Id*. at 432, 910 N.E.2d at 557. Instead, " '[t]o support a reasonable inference of substantial causation from circumstantial evidence, there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked.' " *Id.* at 432, 910 N.E.2d at 557-58 (quoting *Lohrmann*, 782 F.2d at 1162-63).

¶ 60        Our supreme court noted it adopted *Lohrmann*'s " 'frequency, regularity and proximity' " test in *Thacker* as a method for a plaintiff to show enough contact with a defendant's specific product to establish the defendant's product was a substantial factor in being a cause of the plaintiff's injury. *Id.* at 432, 910 N.E.2d at 558. According to the court:

"Thus, if an asbestos plaintiff chooses to establish cause in fact by using the substantial factor test, in order to have the question of legal causation submitted to the jury, the plaintiff must first show that the injured worker 'was exposed to the defendant's asbestos through proof that (1) he regularly worked in an area where the defendant's asbestos was frequently used and (2) the injured worker did, in fact, work sufficiently close to this area so as to come into contact with the defendant's product.' [Citation.] It was

- 31 -

our view in *Thacker* that '[t]hese requirements attempt to seek a balance between the needs of the plaintiff (by recognizing the difficulties of proving contact) with the rights of the defendant (to be free from liability predicated upon guesswork).' [Citation.]" *Id.* at 432-33, 910 N.E.2d at 558.

¶ 61 Our supreme court concluded the plaintiff in *Thacker* "had satisfied the frequency, regularity and proximity test to withstand a directed verdict and allow the issue of legal causation to be submitted to the jury." *Id.* at 433, 910 N.E.2d at 558. Because the court found the jury's ruling in plaintiff's favor was supported by the totality of evidence presented, the court found the trial court correctly denied the defendant's motion for judgment *n.o.v. Id.*

¶ 62 However, as the supreme court pointed out in *Nolan*, *Thacker* does not stand for the proposition "that once a plaintiff meets the frequency, regularity and proximity test, he or she thereby establishes *legal* causation." (Emphasis in original.) *Id.* The court held this erroneous application of *Thacker* by the appellate court "conflicts not only with the clear language of that opinion, but also with our goal of adopting that test to fairly balance the interests of plaintiffs and defendants in these actions." *Id.* at 433-34, 910 N.E.2d at 558. According to the court:

"[W]hen correctly viewed, *Thacker* provides a means for determining whether a plaintiff in an asbestos case has presented sufficient evidence to establish cause in fact and, thereby, shift the *burden of production* to the defendant. We reiterate, however, that the ultimate *burden of proof on the element of causation* remains exclusively on the plaintiff, and that burden is never shifted to the

- 32 -

defendant." (Emphases in original.) *Id.* at 434-35, 910 N.E.2d at 559.

After concluding *Thacker* did not create a presumption of causation, the court turned its attention to "whether the circuit court's exclusion of evidence that decedent was exposed to asbestos from sources other than defendant was in error." *Id.* at 435, 910 N.E.2d at 559.

¶ 63     The trial court in *Nolan* allowed plaintiff to introduce circumstantial evidence to satisfy her burden as to causation. *Id.* However, it excluded evidence which defendant wished to present to rebut the plaintiff's claims and to support its sole-proximate-cause defense. *Id.* The supreme court recognized the trial court felt compelled to bar this evidence because of the appellate court opinions in *Lipke v. Celotex Corp.*, 153 Ill. App. 3d 498, 505 N.E.2d 1213 (1987); *Kochan v. Owens-Corning Fiberglass Corp.*, 242 Ill. App. 3d 781, 610 N.E.2d 683 (1993); and *Spain v. Owens Corning Fiberglass Corp.*, 304 Ill. App. 3d 356, 710 N.E.2d 528 (1999). *Nolan*, 233 Ill. 2d at 436, 910 N.E.2d at 559.

¶ 64     The defendant asked the supreme court to strike down the exclusionary rule crafted and expanded by these decisions. The defendant argued this exclusionary rule skewed the facts in the plaintiff's favor and led "the jury to conclude that the asbestos products of the sole defendant at trial *must* have caused the plaintiff's asbestos-related disease in the absence of evidence of any other asbestos exposure." (Emphasis in original.) This conflicted with the supreme court's decision in *Leonardi*, "which upheld the general validity of the sole proximate cause defense and allowed a defendant to introduce evidence of other potential causes of injury so that the jury may resolve which was a proximate cause." *Id.* at 436, 910 N.E.2d at 560-61.

¶ 65          The supreme court agreed, declaring the appellate court in *Kochan* had taken a one-paragraph explanation of black-letter tort law regarding concurrent tortfeasors and expanded:

> "its exclusionary rule to hold that 'evidence of exposure to other
> asbestos-containing products is not relevant *** in cases in which
> actual cause or cause in fact is disputed.' [Citation.]  In other
> words, the *Kochan* court extended *Lipke* to hold that other-
> exposure evidence is *always* irrelevant, and supported this holding
> with the questionable rationale that because it is 'impossible' to
> determine whether a specific exposure caused injury, '[a]llowing a
> defendant to present evidence of a plaintiff's exposures to other
> products whose manufacturers are not defendants in the trial would
> only confuse the jury,' and, therefore, '[t]he purpose for which the
> evidence is offered is inconsequential.' [Citation.]" (Emphasis in
> original.)  *Id.* at 438-39, 910 N.E.2d at 561.

The court stated the *Kochan* opinion essentially prevented an asbestos defendant from pointing to the negligence of another as the sole proximate cause of a plaintiff's injury.  *Id.* at 439, 910 N.E.2d at 561.  According to the court:

> "The circuit court found *Kochan* to be premised upon a 'fallacious
> argument': although that decision purports to allow defendants to
> present alternative defenses that a particular exposure was not the
> proximate cause of a plaintiff's injury 'simply by showing, for
> example, that plaintiff was not exposed to its products, that

exposure to its products was insufficient to cause injury, or that its

product contained such a low amount of asbestos that it could not

have been a cause of the injury' [citation], the circuit court

concluded that these claimed defenses 'in reality do not exist

because plaintiff will likely call an expert to testify that every

exposure to asbestos is a substantial factor in causation.'  We also

agree with the circuit court that *Kochan* is 'internally inconsistent,'

as we fail to discern how it is both 'impossible' to exclude specific

exposures as a proximate cause, and yet 'simple' for a defendant to

defeat proximate cause at trial.  Indeed, our decision in *Thacker*

establishes that it is possible to exclude particular exposures as

substantial contributing causes of a plaintiff's injury in asbestos

cases, and that proximate cause is properly a question of fact for

the jury to resolve based upon competent evidence.  [Citation.]

The court's holding in *Kochan* improperly deprives a defendant of

a rational alternative explanation, in the form of the excluded

other-exposure evidence, for why the plaintiff is suffering from an

asbestos-related disease." *Id.*

¶ 66    The supreme court emphasized its decisions in both *Thacker* and *Leonardi* stated

the plaintiff bears the burden of proving duty, breach of duty, and proximate cause.  *Id.* at 441,

910 N.E.2d at 562.  The law does not shift the burden of proof to defendant as to proximate

cause.  *Id.*  In addition to a defendant's right to rebut evidence tending to show its actions were

negligent and the proximate cause of a claimed injury, a defendant also " 'has the right to

- 35 -

endeavor to establish by competent evidence that the conduct of a third person, or some other causative factor, is the sole proximate cause of plaintiff's injuries.' " *Id.* at 441, 910 N.E.2d at 563 (quoting *Leonardi*, 168 Ill. 2d at 101, 658 N.E.2d at 459). The supreme court specifically overturned *Kochan* and *Spain*. *Id.* at 443-44, 910 N.E.2d at 563-64. According to the court:

> "As observed by [Justice Steigmann in his dissent] below, the appellate court's erroneous interpretation of *Lipke*, *Thacker* and *Leonardi* in its rulings in *Kochan* and *Spain* left Illinois standing alone in excluding evidence of other asbestos exposures, and conflicted with our well-settled rules of tort law that the plaintiff exclusively bears the burden of proof to establish the element of causation through competent evidence, and that a defendant has the right to rebut such evidence and to also establish that the conduct of another causative factor is the sole proximate cause of the injury." *Id.* at 444, 910 N.E.2d at 564.

¶ 67        Based on our supreme court's opinions in *Leonardi* and *Nolan,* defendant in this case did not have to prove anything. We find plaintiff's argument defendant had no-proximate-cause defense because he had no expert witnesses disclosed on causation is simply incorrect as a matter of law. Defendant did not need to establish UNARCO was the sole proximate cause of plaintiff's condition. However, for plaintiff to prevail, he had to establish defendant was a proximate cause of his asbestosis. While defendant had no obligation to do so, it should have been allowed to present evidence of plaintiff's UNARCO work experience in an attempt to establish plaintiff's exposure at UNARCO was to blame for plaintiff's asbestosis should the jury find plaintiff had asbestosis. Because the trial court did not allow defendant to present this

evidence, once the jury found plaintiff had asbestosis, it could only conclude the asbestosis was caused by plaintiff's exposure to asbestos while working for defendant.

¶ 68    Based on the facts in this case, the trial court's error was particularly egregious, considering a large portion of plaintiff's case was based on plaintiff's exposure to dust from UNARCO's operation while working for defendant.  For the reasons stated in the preceding paragraph, this error clearly was not harmless.  Based on the evidence it heard, the jury clearly found plaintiff had an asbestos-related disease, which it could only blame on defendant because it heard no other evidence with regard to asbestos exposure.

¶ 69    When plaintiff's evidence regarding UNARCO's plant conditions (considering a major component of plaintiff's case was plaintiff's exposure to asbestos dust from UNARCO's operation while working outdoors in the vicinity of the UNARCO facility) and defendant's offers of proof are considered together, not to mention the testimony of Dr. Frank, a jury could have found plaintiff failed to prove defendant caused his asbestosis.  Defendant could have introduced evidence plaintiff worked at UNARCO for a period of three months, a job he quit because it was dirty.  Plaintiff presented evidence the conditions inside the UNARCO plant were horrendous. One of plaintiff's witnesses, Robert Winstead, testified he could not see workers insider the UNARCO facility because it was so dusty inside the building.  Dr. Ginzburg testified, based on his past experience, everyone who worked at UNARCO was exposed to asbestos.  Further, according to Dr. Ginzburg during an offer of proof, it was possible plaintiff's exposure to asbestos while working at UNARCO could have caused plaintiff's pleural plaques and his asbestosis.   Dr. Ginetti also testified plaintiff reported working at UNARCO, which he indicated was an area of high exposure.  According to Ginetti, he had treated other patients exposed to asbestos at UNARCO who were diseased.   Duane Amato testified—depending on plaintiff's job

at UNARCO—it was his opinion within a reasonable degree of industrial hygiene certainty plaintiff could have had an asbestos exposure greater than 25 fiber years while working at UNARCO.

¶ 70        If simply working in the proximity of the UNARCO facility could cause plaintiff's condition, as plaintiff's counsel argued, defendant should have been able to present evidence and argue plaintiff's employment at UNARCO, and not his employment at the railroad, was the only proximate cause of plaintiff's current condition. This is especially true considering Dr. Frank's testimony regarding reentrainment and his opinion asbestosis can result from two to three months of asbestos exposure.

¶ 71        Because we are remanding for a new trial, we need not address the remaining issues raised by defendant.

¶ 72                                III. CONCLUSION

¶ 73        For the reasons stated above, we reverse the judgment in this case and remand for a new trial consistent with this opinion.

¶ 74        Reversed; cause remanded with directions.